IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES GOLBERT, Cook County Public Guardian, on behalf of J.B., K.J., M.J., D.M., J.R., J.S., T.W., and Named Plaintiffs Janiah C., E.C., on behalf of themselves and a class of others similarly situated, | ) ) ) ) ) | Case No. |
| Plaintiff, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| MARC D. SMITH, DEBRA DYER-WEBSTER, BEVERLY J. WALKER, LAUREN WILLIAMS, RYAN GOODWIN, ANTWAN TURPEAU, JANET WUKAS AHERN, JACQUELIN DORTCH, KEITH POLAN, ASHLEY DECKERT, SARI ROWITZ, KAREN AUSTIN-ANTOINE, and the ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## COMPLAINT

Plaintiff Charles Golbert, Cook County Public Guardian, on behalf of J.B., K.J., M.J.,

D.M., J.R., J.S., T.W., and named Plaintiffs Janiah C. and E.C.,[1] on behalf of themselves and a

class of other children similarly situated, by and through their attorneys, Loevy & Loevy,

complain of Defendants Marc D. Smith, Debra Dyer-Webster, Beverly J. Walker, Lauren

Williams, Ryan Goodwin, Antwan Turpeau, Janet Wukas Ahern, Jacquelin Dortch, Keith Polan,

---

[1] For ease of reading, the remainder of the complaint will refer to the named Plaintiffs, except Janiah C., using pseudonyms as follows: (1) J.B. is John; (2) K.J. is Kate; (3) M.J. is Michael; (4) D.M. is David; (5) J.R. is James; (6) J.S. is Jordan; (7) T.W. is Thomas; and (8) E.C. is Elliot. These pseudonyms are distinct from the true legal names of the named Plaintiffs.

Ashley Deckert, Sari Rowitz, Karen Austin-Antoine, and Illinois Department of Children and Family Services (DCFS), and state as follows:

## Introduction

1.      This action challenges the policies and practices promulgated by the Defendants, acting within the Illinois Department of Children and Family Services (DCFS), that cause children to be locked in juvenile jail after a court has ordered them to be released upon the request of their guardian, DCFS.

2.      Each class member was in DCFS's care and, at some point, came in contact with the juvenile justice system and was placed in a juvenile jail. After a court ordered the children released to their guardian—also known as release upon request (RUR)—the Defendants failed to place these children in a safe and appropriate environment, instead causing them to remain wrongfully incarcerated.

3.      The Constitution and federal law require the Defendants, as responsible state officials entrusted with the care of vulnerable children, to ensure that the class members are not locked in jail after an order for their release has issued. This is particularly important because nearly every child in DCFS care has experienced significant trauma in their life and is in need of significant supports and services.

4.      The damage caused by unjustly incarcerating these children is tremendous and undeniable. These children are isolated from loved ones and support systems. They are deprived of the everyday joys, experiences, and opportunities of childhood. Indeed, children incarcerated in juvenile jail are confined to their cells for the majority of the day, have limited opportunities to exercise, and are exposed to unnecessary violence and dangers. Moreover, DCFS is unable to

provide them the clinically appropriate mental health treatment and educational services that they need—critical resources for children who have suffered trauma and instability.

5.      This practice of wrongfully incarcerating children in DCFS care has been public knowledge for decades. Moreover, for years DCFS has tracked children in its care who remain incarcerated with RUR orders, such that Defendants have had direct knowledge of each and every class member who has been wrongfully incarcerated despite an order for their release.

6.      Despite this knowledge, Defendants have done absolutely nothing to end the practice.

7.      Accordingly, Plaintiffs seek damages from Defendants in hopes that this lawsuit will once and for all prevent more children from suffering wrongful incarceration while in DCFS care.

## Jurisdiction and Venue

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, as Plaintiffs assert claims under federal law and to redress the deprivation of their rights secured by the United States Constitution.

9.      Venue is proper under 28 U.S.C. § 1391(b) as, on information and belief, one or more of Defendants reside in this judicial district, Defendant Illinois Department of Children and Family Services conducts extensive operations in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district.

## Plaintiffs

10.      Named Plaintiff Charles Golbert is the Cook County Public Guardian. By orders of the Chief Judge of the Cook County Circuit Court and the Presiding Judge of the Juvenile Justice and Child Protection Division of the Circuit Court ("Juvenile Court"), Mr. Golbert is

appointed attorney and guardian *ad litem* for the children who are the subjects of abuse, neglect, and dependency petitions filed in Juvenile Court. Mr. Golbert has extensive experience in child welfare and civil rights litigation. The Public Guardian brings this suit as next friend on behalf of his child clients and class representatives John, Kate, Michael, David, James, Jordan, and Thomas.

11.     Class Representative John is a minor in the care of Illinois DCFS. John was jailed at the Cook County Juvenile Temporary Detention Center (JTDC) for five and a half months in 2021 and 2022, despite having a court order in place for his release upon request (RUR) during the entirety of that period. While wrongfully incarcerated, John was not able to receive critical services for his rehabilitation and development. For example, John has attention-deficit/hyperactivity disorder (ADHD) and borderline intellectual functioning diagnoses. He requires an Individualized Education Program (IEP) to accommodate his educational needs, but was not able to receive necessary educational services during his incarceration. In fact, John needed glasses so he could participate meaningfully in school and receive an updated IEP, but his incarceration prevented him from getting a needed eye exam. John is very close with his family, especially his mother, but was able to have only very limited interactions with his family during his incarceration. John has several mental health diagnoses, including depressive disorder, conduct disorder, disruptive mood dysregulation disorder, and oppositional defiance disorder. Despite this, DCFS failed to provide John with needed mental health care during his incarceration, including medication monitoring, therapy, and anger management. John's mental health issues have been exacerbated by his wrongful incarceration at JTDC.

12.     Class Representative Janiah was a minor in the care of Illinois DCFS at all times relevant to the events in this Complaint. Janiah entered DCFS care due to a history of physical

4

abuse. Janiah was wrongfully incarcerated in JTDC for a shocking 166 days over a one-year period. An RUR order was in place for the entirety of these 166 days but, in violation of her rights, DCFS left her to languish in juvenile jail. Janiah has been diagnosed with ADHD, bipolar disorder, and depression. Janiah has a history of significant trauma, yet was unable to get the individual therapy, psychiatric treatment, and other mental health services that she needed while wrongfully incarcerated. She was also not able to engage in normal teenage activities, like getting a driver's license, or to learn skills to live independently like cooking. While incarcerated, Janiah lost her grandmother, with whom she was very close, and she was deeply upset by her inability to spend time with family and friends, especially during the holidays. Incarceration has caused a significant deterioration in her mental health and has put her safety at risk.

13. Class Representative Kate is a minor in the care of Illinois DCFS. In early 2022, Kate spent just shy of two months in JTDC despite an existing RUR order. And then in August 2022, Kate was again incarcerated in juvenile jail despite having an RUR order. In response to a motion to end Kate's wrongful incarceration, the court ordered DCFS to place Kate in specialized foster care by mid-September 2022. DCFS flouted this order and continued to wrongfully incarcerate Kate until November, for a total of more than three months of wrongful incarceration. Kate has been diagnosed with ADHD, post-traumatic stress disorder (PTDS), mood dysregulation disorder, and oppositional defiant disorder (ODD). While wrongfully incarcerated, Kate was not able to receive necessary and intensive mental health services.

14. Class Representative Michael is a minor in the care of Illinois DCFS. Michael has been diagnosed with major depression and has a history of suicidal ideations. Michael spent 45 continuous days in JTDC despite a court order for his release. Michael, a very bright young man,

was not able to receive appropriate educational services while incarcerated. Indeed, Michael missed out on an entire quarter of his junior year—credits he had to make up. In addition to falling behind academically, Michael was not able to participate in school social activities that he greatly enjoys (like pep rallies) and afterschool athletic activities while he was wrongfully incarcerated. And Michael's incarceration disrupted and undermined the strong bonds he was able to form with faculty at his school prior to his wrongful incarceration. Michael missed his siblings and was unable to attend his sister's birthday while he was wrongfully confined at JTDC. His wrongful incarceration greatly affected his mental health. At times, Michael worried that DCFS would never find a placement for him.

15. Class Representative David is a minor in the care of Illinois DCFS. Like many children in DCFS care, David has a serious history of trauma and abuse. He has been diagnosed with adjustment disorder. David spent 86 continuous days in JTDC despite an existing RUR order. During his wrongful incarceration, David was not able to receive services critical for his wellbeing and rehabilitation. For example, David was not able to receive help for his substance abuse issues, nor did he receive individual therapy. Prior to his incarceration, he attended a parochial school where he was a bright and engaged student and had a strong relationship with the principal. But during his wrongful incarceration, he was denied the opportunity to continue his education at the school. David was not able to have visits with his younger brother, with whom he is very close, while incarcerated.

16. Class Representative James is a minor in the care of Illinois DCFS. James has been diagnosed with ODD, PTSD, ADHD, language disorder, several learning disabilities, and a mood disorder. James has a long history of physical abuse, and his mental health and behavioral issues are linked to this history. James—a sixteen-year-old kid—has already been held with an

6

RUR order four times, for a staggering total of more than 240 days. James's wrongful incarceration significantly exacerbated his trauma and caused his mental health to deteriorate, undermining his safety and stability. Moreover, James has an IEP to address his multiple learning disabilities, and he was recommended to have specific special educational services, including multi-sensory instruction in all subject areas; but while James was incarcerated, he did not have access to necessary educational and other services.

17.    Class Representative Jordan is a minor in the care of Illinois DCFS. Jordan has been incarcerated despite an RUR order on four separate occasions. During two of these wrongful incarcerations, Jordan was just 13 years old. In total, he has spent more than 150 days in jail when he should have been in an appropriate placement with appropriate services and supports. Jordan's wrongful incarceration in juvenile jail was extremely harmful to him—he was not able to get several assessments and evaluations that he needed for his IEP. He was also not able to receive other needed services, including trauma-focused individual therapy, family therapy, and mentoring. Indeed, the effects of Jordan's trauma have been exacerbated during his incarceration. Jordan's incarceration has further prevented him from engaging in recreational activities, which are critical to helping him build stability and directing him toward a more positive future. And while Jordan has a strong relationship with his family—he particularly enjoys cooking with his grandmother and mother—he was unable to visit with his family or friends while incarcerated.

18.    Class Representative Thomas is a minor in the care of Illinois DCFS. He has been diagnosed with ADHD and intermittent explosive disorder. On three separate occasions, Thomas has been incarcerated in juvenile jail despite an existing RUR order; in total, he has been wrongfully incarcerated for more than 7 months. While incarcerated, Thomas was not able to

receive the mental health services that he needs, causing his mental health to deteriorate. Thomas was incarcerated for his fourteenth birthday and was unable to celebrate holidays and milestones with loved ones. He was deeply affected by his inability to participate in normal childhood activities and to spend time with his friends and family.

19.     Class Representative Elliot was in the care of Illinois DCFS at all times relevant to the events in this Complaint, and was a minor for at least some of that period. Elliot has been diagnosed with depressive disorder, neurodevelopmental disorder, ADHD, and disruptive mood dysregulation disorder. Elliot has a history of significant trauma. Elliot spent just shy of seven straight months in JTDC despite having an RUR order. While incarcerated, Elliot's separation from his family caused him to suffer greatly. Elliot's grandmother passed away, and he could not adequately grieve the loss of his grandmother or lay her to rest with the rest of his family. For at least five months of his wrongful incarceration, he was able to have only limited visits with his siblings. Elliot was even separated from his siblings on the first anniversary of their parents' death, and he had to process that pain alone. Elliot had hoped to work toward his independence, but he was not able to pursue employment or engage in any recreational activities available to other children his age while wrongfully incarcerated. Elliot's mental health severely deteriorated while he was incarcerated, and he routinely pleaded with DCFS for his release.

### DCFS and the RUR Problems

20.     Defendant Illinois Department of Children and Family Services ("DCFS") is the state agency designated to administer and supervise the administration of child welfare services. Approximately one-third of its annual budget is obtained from federal funds, primarily through Title IV-E of the Social Security Act, which matches money for state spending on foster care.

21.     The Children and Family Services Act (20 ILCS 505/7) mandates that DCFS place each of the children in its care in safe and adequate placements, consistent with each child's health, safety and best interests.

22.     DCFS assumes responsibility for the placement and care of a child after a court has determined there is a lawful basis for the State to assume guardianship over the child, including, for example, where there is sufficient evidence that the child is abused, neglected or otherwise dependent on the State for care. DCFS then has the responsibility to house each child in the least restrictive (most family-like) setting that is in the child's best interest.

23.     Children in the care and custody of DCFS—almost all of whom have experienced significant trauma in their short lives—at times come into contact with the juvenile justice system. Sometimes these children are already wards of the State when they are adjudicated delinquent and incarcerated in a juvenile jail. Others become wards of the State only after their adjudication and detention.

24.     These children should be incarcerated in juvenile jails *only* pursuant to court order.

25.     Yet countless children in DCFS care who are ordered RUR are left languishing in juvenile jail for weeks or even months by DCFS. This is part of a widespread and disturbing practice, going back more than 30 years and continuing to this day, whereby DCFS is wrongfully incarcerating children in its care.

### Defendants Each Have the Obligation and Authority to Place Children in the Least Restrictive Setting to Ensure their Health, Safety, and Best Interests

26.     Each of the Individual Defendants in this lawsuit served as a DCFS official with direct and/or supervisory responsibility and authority for ensuring the healthy, safe, and appropriate placement of children in DCFS care, as described in detail below. Each of the

Defendants described below acted under color of law and within the scope of their employment at all times relevant to the allegations in the Complaint.

27.     Marc D. Smith served as DCFS Director from approximately April 2019 to the present. Debra Dyer-Webster served as DCFS Director from approximately February to April 2019. Beverly J. Walker served as DCFS Director from approximately June 2017 to February 2019. Collectively, Smith, Dyer-Webster, and Walker are referred to as "the Director Defendants."

28.     The DCFS Director Defendants were responsible for ensuring that all DCFS programs comply with state and federal law and the U.S. Constitution. The DCFS Director must ensure that all children in DCFS care or under its guardianship are safe, appropriately placed, and receiving appropriate and timely supports and services.

29.     In their capacity serving as DCFS Director, the Director Defendants had the legal authority to increase the existing number of residential and other placements—including but not limited to entering into contracts to develop new placements—in order to provide safe and appropriate placements for every child incarcerated in juvenile jail despite an order for their release.

30.     The Director Defendants also had the authority to direct their subordinates to increase the existing number of residential and other placements and develop new placements— including but not limited to entering into contracts to develop new placements—in order to provide safe and appropriate placements for children incarcerated in juvenile jail despite an order for their release.

31.     Through reports of placement outcomes from subordinates and other sources discussed in more detail below, the Director Defendants were aware of the widespread problem

of children being held in juvenile jails despite RUR orders, including the failure to timely and appropriately place each and every class member.

32.    Despite this knowledge, the Director Defendants failed to take available and necessary steps to ensure that all children in DCFS care with an order for their release from juvenile jail had ready and appropriate placements.

33.    Defendant Lauren Williams served as Associate Deputy Director of Community Resources Management during the class period.[2]

34.    In her capacity as Associate Deputy Director of Community Resources Management, Williams was responsible for developing policies and procedures for placing children in DCFS care, especially children with significant emotional and behavioral needs; implementing a system to track referrals to placement providers and determine outcomes; identifying placement gaps; and analyzing placement data and identifying trends and issues.

35.    Williams was also responsible for notifying executive staff (including the Director) and central and regional management about placement outcomes and making policy changes to address placement gaps.

36.    Williams was also responsible for supervising the DCFS's Central Matching Unit and, in that capacity, for ensuring that every child had an appropriate placement upon release from a jail or detention center.

37.    In short, Williams was aware of each and every child in DCFS care that remained incarcerated despite an order for their release, including each Plaintiff and class member, and Williams had the ability and authority to create or amend DCFS policies so that placements were

---

[2] This position was formerly titled Associate Deputy Director of Placement Resources.

timely located for children in DCFS care who were ordered or soon to be ordered released from juvenile jail.

38.     Williams, as supervisor of the Central Matching Unit, also had the ability and authority to create or locate (or direct subordinates to create or locate) appropriate placements and services for each Plaintiff and class member.

39.     Despite this, Williams failed to ensure that policies and procedures were in place to appropriately and timely place children in DCFS care who had an RUR order. Indeed, DCFS does not begin the process of finding an appropriate placement for incarcerated children in its care until the child is actually ordered to be released from juvenile jail.

40.     Williams additionally failed to ensure that the Central Matching Unit timely matched each Plaintiff and class member with appropriate placements and services.

41.     Ryan Goodwin and Antwan Turpeau both served as the Associate Deputy Director of Delinquency Prevention during the class period.

42.     As the Associate Deputy Director of Delinquency Prevention, Goodwin and Turpeau oversaw, among other things, the Dually Involved Youth Unit and were responsible for formulating and implementing policies to (1) ensure that necessary services and supports were provided to dually involved youth and (2) promote the rehabilitation of those children.

43.     In their role as Associate Deputy Director of Delinquency Prevention, Goodwin and Turpeau had the authority and ability to add DCFS services and supports to placements for Dually Involved Youth to ensure that those placements were appropriate and able to receive children ordered released from juvenile jails.

44.     While serving as Associate Deputy Director of Delinquency Prevention, Goodwin and Turpeau regularly attended meetings where they were notified of each and every child in

DCFS care who was wrongfully incarcerated despite an existing RUR order, including each and every Plaintiff and class member.

45.     Despite being aware of the wrongful incarceration of each Plaintiff and class member, Goodwin and Turpeau failed to take steps within their authority and ability to ensure that available placements had the services and supports necessary to receive Plaintiffs and other class members and to ensure that Plaintiffs and class members were in fact receiving necessary supports and services.

46.     Janet Wukas Ahern served as the Guardianship Administrator from November 2017 through the present.

47.     As DCFS Guardianship Administrator, Ahern is responsible for the wellbeing of all children in DCFS care, administers all DCFS programs related to guardianship, and evaluates and develops DCFS policy on the same topic.

48.     Through her role as Guardianship Administrator, Ahern had the authority and ability to develop more placement capacity in existing placements, develop new placement resources including residential placements, and add supports to existing placements to ensure children did not stay incarcerated after receiving RUR orders.

49.     In her position as Guardianship Administrator, Ahern was informed every time a child in DCFS care, including each class member, continued to be incarcerated in a juvenile jail despite having an RUR order.

50.     Despite knowing that the Plaintiffs and class members were being held in juvenile jail despite an order for their release and despite having the ability and authority to ensure that they were timely and properly placed, Ahern failed to take steps to do so.

51.     Jacquelin Dortch, Keith Polan and Ashley Deckert each served as the Deputy Director of Child Services during the class period. Collectively, Dortch, Polan and Deckert are referred to as the "Child Services Defendants."

52.     The Child Services Defendants were responsible for contract implementation for all programs related to community resources, foster care, and residential treatment, as well as advising executive staff and other DCFS management on implementation of the consent decree regarding the appropriate placement of all children in DCFS care. The Child Services Defendants also oversaw DCFS Community Resources, Foster Care and Residential Recruitment, and Delinquency Prevention Programs.

53.     The Child Services Defendants therefore had the ability and authority to develop more placement capacity in existing placements, develop new placement resources including residential placements, and add supports to existing placements to ensure children did not stay incarcerated after receiving RUR orders.

54.     Through their role at DCFS, the Child Services Defendants were aware of the pervasive and serious problem of the wrongful incarceration of children in DCFS care. In fact, Defendant Dortch provided testimony and/or public statements on behalf of DCFS regarding DCFS's failure to provide appropriate placements for incarcerated children who have an order for their release.

55.     Despite their knowledge of the widespread problem of wrongfully incarcerating children in DCFS care—including the unlawful incarceration of each Plaintiff and class member— the Child Services Defendants failed to exercise their authority and take available steps to correct the problem.

56. Sari Rowitz and Karen Austin-Antoine each served as the Clinical Placement Manager in Cook County during the class period.

57. As the Clinical Placement Manager, Rowitz and Austin-Antoine were responsible for, among other things, developing and managing DCFS's Centralized Matching process; managing the placement of all children in DCFS care in Cook County; maintaining a working knowledge of all placements under contract with DCFS; formulating criteria to match children with those placements; reviewing the sufficiency of placements; and creating new placements or adding services or capacity to existing placements to ensure that the needs of all children in DCFS care in Cook County are met.

58. In their role at DCFS, Rowitz and Austin-Antoine had the ability and authority to ensure that there were policies and procedures in place to match all children in DCFS care with appropriate placements, to develop new placement resources including residential placements, and add supports to existing placements to ensure children did not stay incarcerated after receiving RUR orders in Cook County.

59. In short, as Clinical Placement Managers, Rowitz and Austin-Antoine were aware of each and every Plaintiff and class member who was incarcerated in JTDC despite an order for their release, and failed to take necessary and available steps to timely place them in appropriate placements.

**Defendants Were Aware of the Widespread and Longstanding RUR Problem in DCFS**

60.     Since as far back as at least 1988, DCFS administrators and staff were aware of a disturbing practice: children in DCFS care were being held in juvenile jails long after courts ordered their release.

61.     Each of the Defendants named in this lawsuit has been made aware of this longstanding problem through their positions at DCFS, including through court filings and hearings, correspondence, meetings, internal data and reports, the legislature, media, and other sources. Nevertheless, the problem has continued unabated.

62.     In 1988, a class of children in DCFS care filed suit seeking injunctive relief against the agency, *BH v. Johnson*, Case No. 88 C 5599 (N.D. Ill.). Among other allegations, the children complained that they were being wrongfully imprisoned in juvenile jails.

63.     Eventually, this Court entered a consent decree requiring DCFS to ensure that children are "timely and stably placed in safe and appropriate living arrangements" and in "the least restrictive setting appropriate for the child."

64.     Sadly, that decree has been routinely ignored for many children over the ensuing decades, including for every single Plaintiff and class member.

65.     Since then, numerous court filings have continued to bring attention to and sought to remedy the fact that numerous children in DCFS care are regularly held in juvenile jails despite court orders for their release.

66.     For example, a 2015 Emergency Motion to Enforce the Consent Decree advised that DCFS's own data showed an "acute shortage[] of adequate services and placements . . . resulting in hundreds of children in the State's care being left to languish in psychiatric hospitals, shelters, detention centers and residential treatment centers long after DCFS knew the children

16

needed to be placed elsewhere." The motion further stated that children were being "warehoused" in "correctional facilities for extended periods of time, long after those responsible for their care acknowledge that the children need to be removed to appropriate settings."

67. The Public Guardian's Office has also continued to raise to DCFS the issue of children held in jail despite RUR orders. The examples listed below are a mere sample of the steady stream of correspondence over the past several decades directed at senior DCFS officials, including Defendants, sounding the alarm bells about RUR problems at DCFS.

   a. In a 2006 letter to the DCFS Director, the Public Guardian described the results of an informal study that found children in DCFS care were being "maintained in correctional/detention facilities when they would be released if appropriately placed," warned of the irreparable damage resulting from this practice, and demanded that the Director take immediate, concrete action to address the problem.

   b. A 2006 Placement Study Report from the Public Guardian similarly detailed this problem, noting that at the time of the report, at least four children in DCFS care were being wrongfully incarcerated in juvenile jails despite RUR orders.

   c. In 2008, the Public Guardian sent a similar letter to the DCFS Director and other DCFS administrators, as well as the Court overseeing *B.H.*, this time providing an example of a child, Andre, who was unlawfully incarcerated in a juvenile jail for three months because DCFS failed to locate an appropriate placement for him. While incarcerated, Andrew was allowed only limited time outside.

   d. In March 2016, the Public Guardian sent another letter to the DCFS Director and General Counsel as well as the Court overseeing *B.H.*, emphasizing the shortage

of placements and providing the example of a 15-year-old child, James, who had been improperly locked in a juvenile jail for over four months. The letter detailed specific pilot programs that DCFS should implement in order to address this serious problem.

e. In June 2016, the Public Guardian wrote directly to the DCFS Director and General Counsel, noting extreme concern about DCFS's decision to close facilities dedicated to children in DCFS care and reduce funding for existing placements, identifying serious consequences (including a lack of appropriate placements) that were likely to result for children in DCFS care.

f. In July 2016, the Public Guardian sent another letter to the DCFS Director, General Counsel, Supervisory Regional Counsel, and the Court overseeing *B.H.*, this time providing an example of a child wrongfully held in a detention center for almost two months (despite an existing court order for his release), warning about the lack of adequate placements, and demanding action to address the problem.

g. In October 2016, public testimony from the Public Guardian to the Senate Human Services Sub-Committee on Issues Related to Illinois DCFS reiterated these problems, highlighting the long waiting lists for much needed residential treatment centers. Similar public testimony was provided to the Illinois Senate Human Services Committee in May 2018.

h. Public testimony from the Public Guardian in April 2019 again decried DCFS's practice of illegally incarcerating children in their care, providing a specific example of a thirteen-year-old girl—a victim of physical and sexual abuse—who was held in a juvenile jail for 36 days after the court ordered her release.

i. In November 2021, the Public Guardian wrote to DCFS General Counsel and the Court overseeing *B.H.*, again expressing extreme concern for "the dozens of children who remain incarcerated in Juvenile Detention Centers even though a Juvenile Judge has cleared the child for 'release upon request' of their guardian. . . . This can last for days, weeks or months. Of course, this is illegal, a profound civil rights violation, and clinically devastating." The letter further noted that 66 children in DCFS care were incarcerated after an order for their release during the first 10 months of 2021. At least 30 of these 66 children were unlawfully incarcerated for a month or longer.

68. The Illinois Senate, acknowledging the seriousness of the problem, directed the Auditor General to conduct a performance audit of DCFS and to specifically examine the number of children who were held in detention facilities and other inappropriate placements. In 2016, the Auditor General issued a report. This report found that, despite being well-aware of the problem of children in its care being unlawfully incarcerated in juvenile jails after orders for their release, DCFS had taken no steps to track scheduled release dates for these children and had failed to develop any procedures for placing children who are ready to leave juvenile detention centers. The report further explained the reasons why children were being improperly incarcerated after an RUR order and found that (during the audit period) at least one child had been wrongfully incarcerated in a juvenile jail for as long as *315 days* after a court ordered them RUR.

69. Starting in 2018, DCFS was required by Illinois law to submit annual reports to the General Assembly that detailed, among other things, the number of children held in detention

centers after an order for release and simply because DCFS had failed to appropriately place them.

70.     For example, DCFS reported that 42 children in DCFS care (some as young as 13) were unlawfully incarcerated in juvenile jail between January 1 and June 30, 2018. And in fiscal year 2021, there were at least 66 such wrongfully incarcerated children; one child was only 11 years old, and at least three children were wrongfully incarcerated for more than 10 months.

71.     Additionally, a list is generated daily of all children who are being detained in juvenile jails despite having outstanding RUR orders. This list is sent to individuals within DCFS's General Counsel's office. Upon information and belief, these lists or the information therein are shared with the DCFS Director and other Defendants.

72.     Representatives of the DCFS Director attend regular meetings with JTDC where they discuss the list of children who remain incarcerated despite RUR orders. DCFS also provides weekly updates to the Juvenile Court regarding these children and any efforts being undertaken to find an appropriate placement for them.

73.     For more than a decade, a committee focused on the issue of children held in juvenile jail despite RUR orders has met monthly to discuss the problem. Information about specific incarcerated children with RUR orders is discussed at this meeting. The meeting has been attended regularly by Defendant Turpeau and then Defendant Goodwin, as well as Representatives of the DCFS Director, among others.

74.     Additionally, various individuals within DCFS are obligated to track and compile data regarding placement outcomes for children in DCFS care. For example, the Clinical Placement Manger is responsible for tracking all referrals to placement providers, determining outcomes, identifying and analyzing trends from this data, making recommendations to address

shortcomings, and providing routine reports regarding placement and service gaps, including for children who are held in juvenile jail solely because DCFS has failed to provide an appropriate placement. These reports and data are provided to DCFS management, including the Director and Deputy Directors.

75.     The practice of keeping kids in jail despite RUR orders has received significant media attention and public outcry. For example, following an investigation, WBEZ reported that dozens of children were being held in the JTDC for weeks or months after a judge ordered their release because their guardian—the State—failed to place them appropriately. Representatives of DCFS, including the Chief Deputy Director of Clinical and Child Services, provided statements for the news reports, acknowledging the problem.

76.     Each Defendant was therefore aware of the pervasive and disturbing practice of wrongfully incarcerating children who are in DCFS care as well as the obvious and serious harms resulting from this practice.

77.     Over the years, the problem of wrongfully incarcerated children in DCFS care has grown, and each of the Defendants knew it. The problem exploded in 2018, with large numbers of children wrongfully incarcerated while in DCFS care.

78.     In 2021, the numbers were staggering. That year:

    a.    There were more than 80 examples of children being incarcerated in the JTDC despite having RUR orders.

    b.    Children who were incarcerated in JTDC despite having RUR orders were, on average, wrongfully incarcerated for more than 40 continuous days at a time.

c.  In total, children in DCFS care were incarcerated for more than 3,200 days in JTDC simply because DCFS did not provide timely and appropriate placements for them.

**Defendants' Failure to Address the RUR Problem Constitutes Disability Discrimination**

79.  Many of Plaintiffs and class members were suffering from a disability at the time they were wrongfully incarcerated in JTDC. Namely, many of the Plaintiffs and class members had a mental health issue, intellectual disability, developmental disability and/or learning disability at the time of their wrongful incarceration.

80.  Defendants' actions and failures to act, described in detail elsewhere in the Complaint, caused Plaintiffs and class members with disabilities to be wrongfully incarcerated in JTDC despite orders for their release *because of* their disabilities. While incarcerated, these Plaintiffs and other class members were deprived of needed recreational activities and other supports and services.

81.  Defendants' failure to take the necessary, appropriate and available steps to develop sufficient placement capacity affected many children in DCFS care, but it had a disproportionate impact on these Plaintiffs and class members due to their disability, causing unique categories and quanta of harms, including in many cases exacerbating the symptoms or severity of their mental health challenges and/or setting back their education.

82.  There is a direct causal link between Defendants' failure to find an appropriate placement for each disabled Plaintiff and class member, and those children's disabilities. But for their disabilities, Defendants would have placed the children and their time wrongfully incarcerated with RUR orders would have been significantly reduced or eliminated entirely.

22

83.     Indeed, but for their disabilities, disabled Plaintiffs and class members would not have had to wait for a placement while incarcerated in juvenile jail, where they were not able to receive needed mental health, educational, recreational and other services; isolated; and exposed to violence.

84.     If Defendants had acted to provide reasonable modifications to their placement procedures—for example, by adding additional supports to a placement such as one-on-one aides or additional funding for other programming or services—disabled Plaintiffs and class members would have been placed sooner, significantly reducing or eliminating the time they were incarcerated with RUR orders. However, Defendants failed to reasonably modify these procedures, such that Plaintiffs' and class members' disabilities caused them to be wrongfully incarcerated with RUR orders.

85.     As described in detail elsewhere in this Complaint, Defendants knew about the problem of children in DCFS care being held in jail with RUR orders; Defendants failed to take the necessary, appropriate and available steps to solve this problem, despite knowing that these Plaintiffs and class members suffered from disabilities and that these failures to act would impact them due to their disabilities.

**Unlawfully Incarcerating RUR Children Costs Local Taxpayers Money**

86.     DCFS officials have pushed the false narrative that the practice of unlawfully incarcerating children in juvenile jails despite court orders for their release is unavoidable because the affected children have no other available placements when they are ready to be discharged.

87.     Underlying this false narrative is the false premise that there is not enough money to provide adequate placements for RUR children.

23

88.     First, a lack of funds is no defense to this suit. By statute, Defendants are empowered to spend whatever funds are necessary to find appropriate placements for every child in DCFS custody, including Plaintiffs and class members.

89.     Second, it is false that appropriate placements will cost more than leaving children to languish in JTDC. To the contrary, ending the unlawful incarceration of RUR children will actually save local taxpayer money. Indeed, the unlawful incarceration of RUR children is not only inhumane, it is fiscally irresponsible.

90.     There are appropriate placements that can be created or made available for RUR children, and care providers are eager to work with DCFS to create more placements to meet any demand.

91.     Appropriate placements in residential treatment facilities for RUR children generally cost about $300-400 dollars per day, with 50% of that cost reimbursed by the federal government. Therapeutic or specialized foster care for these children costs even less, and are similarly reimbursed by the federal government.

92.     In contrast, the cost of incarcerating children in juvenile jail is well over $500 per day.

93.     And critically, unlike the costs of housing a child in foster care or residential treatment facilities, NO portion of incarcerating a child in JTDC is reimbursed by the federal government.

94.     This means that wrongfully incarcerating RUR children in juvenile jail is more than twice as expensive as every other Constitutionally permissible and appropriate placement for these children. Even using conservative estimates, it costs local taxpayers approximately an extra $300 per day to wrongfully incarcerate a child in DCFS care (the difference between the

cost to house a child in DCFS, and the cost to place a child in a residential treatment facility after federal reimbursement).

95.     These costs add up quickly. Multiplying $300 by the 3,200 days children spent wrongfully incarcerated in the JTDC in 2021, DCFS's illegal incarceration of children in its care in *Cook County alone* imposed an additional cost of almost one million dollars on local taxpayers last year.

96.     In other words, DCFS wastes millions of local taxpayer dollars to *harm* the children in its custody and care. These figures do not include the added cost needed to repair the harm caused by wrongfully incarcerating children. In short, the practice of wrongfully incarcerating RUR children is both inhumane and fiscally irresponsible.

### The Harm Caused by Holding Children RUR

97.     Wrongful incarceration during adolescence or young adulthood is associated with worse general health, stress-related illnesses, higher rates of depression and higher incidents of suicidal thoughts during adulthood.

98.     Children wrongly incarcerated in the Cook County JTDC—where all class members are wrongfully detained—spend much of the day locked in their small cells with only a mattress and a toilet.

99.     The longer these children are held in detention, the more they are exposed to violence and threats of violence, increasing the risk that they will suffer emotional and physical harm.

100.     Incarcerated children are strictly controlled. They have limited opportunities to engage in recreation. And the JTDC's school curriculum and assessments are inappropriate for the individual needs of the Plaintiffs. For example, James has an IEP to address his intellectual

disability, but he was not able to receive the recommended educational accommodations during the approximately 5 months he was wrongfully imprisoned between June 2021 and June 2022.

101.    Children incarcerated at JTDC have very limited opportunities to interact with family and other loved ones, including friends.

102.    These incarcerated children are also unable to access needed services and programming—especially mental health services which are desperately needed by a group of children who have suffered significant trauma; are separated from friends and loved ones; and are not able to engage in recreational activities that other children of their age enjoy.

103.    In short, wrongfully extended incarceration in JTDC causes significant harm to Plaintiffs and the class members, including exacerbating their trauma and mental health issues; setting them back academically; interfering with relationships with loved ones; destabilizing them and exposing them to violence and unsafe conditions; and depriving them of the joys and experiences that all children should be free to enjoy, among other things.

104.    Defendants' decision to allow Plaintiffs and the class members to languish in JTDC without an end in sight also conveys a clear message to the children that they do not matter. This indefinite incarceration imposes significant trauma on children who have already suffered unstable family lives and who are dependent on the state to provide appropriate care.

**Class Action Allegations**

105.    Plaintiff Golbert, on behalf of his child clients, John, Kate, Michael, David, James, Jordan, and Thomas, and named Plaintiffs and class representatives Janiah and Elliot, bring this action on behalf of themselves and a class of those similarly situated, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

106.    Plaintiffs seek to represent a class consisting of the following people:

All those who have been placed in the care or under the guardianship of DCFS at any time on or after January 1, 2018 and who were incarcerated in juvenile jail for at least 7 consecutive days after a court order for their release upon request and whose claims are not barred by the applicable statute of limitations as of the date of filing of Plaintiffs' original complaint.

107.     Plaintiffs other than Jordan also seek to represent a subclass consisting of the following people:

All those who have been placed in the care or under the guardianship of DCFS at any time on or after January 1, 2018 and who were incarcerated in juvenile jail for at least 7 consecutive days after a court order for their release upon request, whose claims are not barred by the applicable statute of limitations as of the date of filing of Plaintiffs' original complaint, and who had a disability within the meaning of the Americans with Disabilities Act at the time they were held RUR.

108.     As each Individual Defendant assumed or carried out their positions in DCFS, they had an opportunity to end the practice of incarcerating children with RUR orders but did not do so, as described in more detail elsewhere in this Complaint. Rather than end it, each Individual Defendant knowingly perpetuated it, thereby cementing the practice of incarcerating children with RUR orders and making Defendants liable for the constitutional violations and violations of state and federal law that befell Plaintiffs and the class members from the time they assumed the position referenced above to the present.

109.     Based on publicly available data, Plaintiffs estimate that the class encompasses well over 100 children.

110.     Common questions of law and fact exist to all class members. Among these common questions are:

      a.     Whether any legitimate governmental purpose exists to incarcerate the class members in juvenile jail once they have been ordered released upon request

      b.     Whether the Individual Defendants maintained a practice of violating class members' rights under the due process clause of the Fourteenth Amendment through this practice of incarcerating them despite RUR orders; and

      c.     Whether the Individual Defendants and Defendant DCFS deprived subclass members of less restrictive housing on the basis of their disabilities and thus violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

111.     The claims of the class representatives (both the named Plaintiffs and those whose claims are brought by Plaintiff Golbert as their appointed attorney and guardian *ad litem*) are typical of the claims of the class. Each of the class representatives was incarcerated despite an RUR order, in violation of the constitution, due to the same practices as the rest of the members of the class. Class representatives seek to prove that Defendants violated their rights and the rights of all class members due to Defendants' liability for the practices described in this Complaint.

112.     The Class representatives will fairly and adequately represent the interests of the class. They have retained counsel experienced in class action, civil rights, and conditions of confinement litigation.

113.     The further requirements of Federal Rule of Civil Procedure 23(b)(3) are met here, in that questions of law and fact common to members of the class, which are described

above, predominate over any individual issues that may exist. In addition, a class action would

be the most efficient method of adjudicating the class members' claims and is therefore the

superior method of adjudication.

### Count I – Class Claims Pursuant to 42 U.S.C. § 1983 for Violations of the Fourteenth Amendment (against the Individual Defendants only)

114.    Each paragraph of this Complaint is incorporated herein.

115.    There is no legitimate governmental purpose for incarcerating a child in juvenile

jail who has an RUR order.

116.    The Individual Defendants, cloaked under color of law, had a duty to protect

Plaintiffs and the class members from physical and emotional harm.

117.    The Individual Defendants knew or should have known that subjecting Plaintiff

and the class members to the practice of incarcerating them despite RUR orders created a risk

that Plaintiffs and the class members would suffer physical and/or severe emotional harm.

118.    In failing to address the known risk posed to Plaintiffs and the class members, the

Individual Defendants acted unreasonably and allowed Plaintiffs and the class members to suffer

the consequences of being wrongfully incarcerated children.

119.    As a consequence of the Individual Defendants' failure to keep Plaintiffs and the

class members from being wrongfully incarcerated, Plaintiffs and the class members suffered

harm, including but not limited to, severe emotional distress.

### Count II – Class Claims Pursuant to Rehabilitation Act 29 U.S.C. § 794(a) (against all Defendants)

120.    Each paragraph of this Complaint is incorporate herein.

121.    Section 504 of the Rehabilitation Act states that no otherwise qualified individual

with a disability shall be "excluded from participation in, be denied the benefits of, or be

subjected to discrimination in any program or activity receiving Federal financial assistance."
29 U.S.C. § 794(a).

122.    Disabled Plaintiffs and the subclass members are qualified "individuals with a disability" within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(a) because they have a mental health, intellectual, or developmental disability.

123.    DCFS, as a department of the State of Illinois, received "federal financial assistance" within the meaning of 29 U.S.C. § 794(a).

124.    The operations of DCFS are a "program or activity" that falls within the meaning of 29 U.S.C. §§ 794(b)(1)(A)-(B) and/or (b)(2)(B).

125.    Disabled Plaintiffs and subclass members were excluded from and were denied the benefits of placement in less restrictive housing due to their disability.

126.    Disabled Plaintiffs and subclass members were discriminated against by Defendant DCFS and the Individual Defendants based on their mental health, intellectual, or developmental disabilities and were denied less restrictive housing as a direct and proximate result.

127.    As a direct and proximate result, disabled Plaintiffs and class members suffered harm.

### Count III – Class Claims Pursuant to Americans with Disabilities Act
### 42 U.S.C. § 12132
### (against all Defendants)

128.    Each paragraph of this Complaint is incorporate herein.

129.    Disabled Plaintiffs and the subclass members are qualified "individuals with a disability" within the meaning of Title II of the ADA because they have a mental health, intellectual, or developmental disability.

130.    Title II of the ADA prohibits public entities from excluding qualified individuals from participation in services, programs, or activities.

131.    The claims under the ADA are brought against Defendant DCFS as a department of the State of Illinois and against the Individual Defendants.

132.    Defendant "DCFS" is a public entity within the meaning of 42 U.S.C. § 12131(1).

133.    In violation of Title II of the ADA, disabled Plaintiffs and subclass members have been discriminated against on the basis of their disabilities, and were thus excluded from participating in, and were denied the benefits of, placement in less restrictive housing due to their disabilities.

**Requests for Relief**

WHEREFORE, Plaintiffs respectfully requests that this Court:

a.  Certify this case as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and appoint the undersigned as class counsel pursuant to Rule 23(g); and

b.  Enter judgment in Plaintiffs' favor and against Defendants, awarding compensatory damages, costs, and attorneys' fees against all Defendants, and awarding punitive damages against all Individual Defendants; and

c.  Grant any other relief this Court considers just and proper.

**Jury Demand**

Plaintiffs respectfully demand trial by jury, on behalf of themselves and the class members, on all issues so triable.

RESPECTFULLY SUBMITTED,

/s/ Megan Pierce

Attorneys for Plaintiff

Jon Loevy
Russell Ainsworth
Megan Pierce
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900