UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES GOLBERT, et al.,

    Plaintiffs,

    v.

MARC C. SMITH, et al.,

    Defendants.

Case No. 23-cv-00300

Judge Martha M. Pacold

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles Golbert and other named and anonymous plaintiffs filed this complaint on behalf of themselves and a putative class of persons who were allegedly detained by the Illinois Department of Children and Family Services ("the Department" or "DCFS") for an extended period of time without lawful basis.

Plaintiffs sue twelve department officials—Marc D. Smith, Debra Dyer-Webster, Beverly J. Walker, Lauren Williams, Ryan Goodwin, Antwan Turpeau, Janet Wukas Ahern, Jacquelin Dortch, Keith Polan, Ashley Deckert, Sari Rowitz, and Karen Austin-Antoine—under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794(a). With respect to their § 1983 claims, plaintiffs allege that the individual defendants violated plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment. Plaintiffs also sue the Department itself under Title II and the Rehabilitation Act.

Defendants move to dismiss plaintiffs' claims under Rule 12(b)(6) and to strike class allegations under Rule 12(f). [10].[1] For the reasons below, defendants' motion to dismiss is granted in part and denied in part. Defendants' motion to strike class allegations is denied.

## BACKGROUND

The court draws the following facts from the allegations in the complaint, which must be accepted as true for purposes of the motion to dismiss. *See Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018) (citation omitted).

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the CM/ECF page number.

In Illinois, the state may take legal custody of children who are abused or neglected by their parents or guardians, or who are otherwise dependent on the state for their care. [1] ¶ 22; *see* 705 ILCS 405/2-27. State law tasks the Department with administering and supervising child welfare services consistent with each child's health, safety, and best interest. *Id.* ¶¶ 20, 21; *see* 20 ILCS 505/1 (discussing the Department's statutory mission "to provide social services to children and their families, to operate children's institutions, and to provide certain other rehabilitative and residential services as enumerated in" the Children and Family Services Act).

Some of these children commit (or are suspected of committing) crimes. Those adjudicated delinquent may be incarcerated in a juvenile detention center, but only pursuant to court order. [1] ¶¶ 23, 24; *see* 705 ILCS 405/5-501(2). Detained children are entitled to periodic hearings to determine "whether there is an urgent and immediate necessity to detain the minor for the protection of the person or property of another." 705 ILCS 405/5-501(2).

According to the complaint, once the court issues a release-upon-request ("RUR") order—for instance, because there is no longer an urgent and immediate necessity justifying continued detention—the Department must release the child and place them somewhere "consistent with the child's best interests," such as with a relative or foster family.[2] [1] ¶ 2; *see* 20 ILCS 505/7 (listing requirements and considerations for the "[p]lacement of children"). But even after the issuance of a release-upon-request order, the Department might not immediately place children with an appropriate long-term caregiver. Whether plaintiffs and class members can hold defendants liable when a child is detained despite a court order is the subject of this lawsuit.

Defendants Smith, Dyer-Webster, and Walker served as Directors of the Department. [1] ¶ 27. As alleged, they failed to "increase the existing number of residential and other placements—including but not limited to entering into contracts to develop new placements—in order to provide safe and appropriate placements for every child incarcerated in juvenile jail despite an order for their release." *Id.* ¶ 29.

Defendant Williams served as Associate Deputy Director of Community Resources Management. *Id.* ¶ 33. Her job was to ensure that children are appropriately placed with caregivers, and to make "policy changes to address placement gaps." *Id.* ¶¶ 34–35. As alleged, she failed to "create or amend DCFS

---

[2] The parties dispute the legal effect of a "release-upon-request" (RUR) order, and whether DCFS may decline to request the release of a child in its legal custody. *Compare* [16] at 7–8, *and* [33] at 7–10, *with* [23] at 9–11. While defendants ask the court to take "judicial notice" of their limited role in the detention process (relative to the Cook County Juvenile Temporary Detention Center), their arguments do not cite pertinent legal authorities. *See* [16] at 7. The complaint alleges that they were detained contrary to court orders. [1] ¶¶ 24–25. Defendants may refute this and other allegations at a later stage in this litigation.

policies so that placements were timely located for children in DCFS care . . . ." *Id.* ¶¶ 37–40.

Defendants Goodwin and Turpeau served as Associate Deputy Directors of Delinquency Prevention. *Id.* ¶ 41. As alleged, they failed to secure the "services and supports" that delinquent children need for their rehabilitation. *Id.* ¶¶ 42, 45.

Defendant Ahern served as the Department's Guardianship Administrator. *Id.* ¶ 46. Defendants Dortch, Polan, and Deckert served as Deputy Directors of Child Services. *Id.* ¶ 51. Defendants Rowitz and Austin-Antoine served as the Department's Clinical Placement Managers. *Id.* ¶ 56. As alleged, these defendants failed to "develop more placement capacity in existing placements, develop new placement resources including residential placements, and add supports to existing placements to ensure children did not stay incarcerated after receiving RUR orders." *Id.* ¶¶ 48, 53, 58.

In short, the complaint alleges that the Department and its officials failed to appropriate enough funds toward "ensur[ing] a sufficient number of placement and other resources of sufficient quality and variety to meet the needs of children and families . . . ." 20 ILCS 505/2.1; *see* [1] ¶¶ 21–25, 28. State law does not recognize "a private right of action or a judicially enforceable claim" against defendants for their alleged omissions. 20 ILCS 505/2.1. Plaintiffs instead bring this suit under federal law, alleging that defendants have violated their rights under the ADA and Rehabilitation Act, and the individual defendants have violated their rights under the Fourteenth Amendment.

## LEGAL STANDARD

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation and internal quotation marks omitted).

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not give rise to a plausible entitlement to relief. *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I. Section 1983 Claims

The court will first address plaintiffs' constitutional claims, brought under 42 U.S.C. § 1983 "against the Individual Defendants only." [1] at 29. The individual

3

defendants argue that the doctrine of sovereign immunity bars these claims. *See* [16] at 10. The court agrees.

"After independence, the States considered themselves fully sovereign nations." *Franchise Tax Bd. v. Hyatt*, 587 U.S. 230, 237 (2019). One "fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution" was immunity from suit by private parties. *Alden v. Maine*, 527 U.S. 706, 713 (1999); *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (noting that it "is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent" (quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890))). When the "States entered the Union," they did so with this immunity "intact, unlimited by Article III's jurisdictional grant." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). Thus, "[i]n our constitutional scheme, a federal court generally may not hear a suit brought by any person against a nonconsenting State." *Allen v. Cooper*, 589 U.S. 248, 254 (2020). Though state sovereign immunity "neither derives from, nor is limited by, the terms of the Eleventh Amendment," *Alden*, 527 U.S. at 713, the Amendment "confirm[s] the structural understanding that States entered the Union with their sovereign immunity intact." *Stewart*, 563 U.S. at 253; *see P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity.").

Immunity is a "privilege *of the sovereign*," *Stewart*, 563 U.S. at 253 (emphasis added), and thus "belongs to the state alone by virtue of its sovereignty," *Hopkins v. Clemson Agric. Coll. of S.C.*, 221 U.S. 636, 645 (1911); *see Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 400 (1979) ("By its terms, the protection afforded by [the Eleventh] Amendment is only available to 'one of the United States.'"). When—as here—"the state is not named as a defendant, sovereign immunity attaches only to entities that are functionally equivalent to states" or when "the suit effectively operates against the state as the real party in interest." *City of Oakland ex rel. Bd. of Port Comm'rs v. Fed. Mar. Comm'n*, 724 F.3d 224, 227 (D.C. Cir. 2013); *see Green v. Graham*, 906 F.3d 955, 961–62 (11th Cir. 2018) ("The Supreme Court has consistently recognized that sovereign immunity belongs to the state, and only derivatively to state entities and state officials."). Thus, while "[a]n officer in an individual-capacity action . . . may be able to assert *personal* immunity defenses," such as qualified immunity, "sovereign immunity 'does not erect a barrier against suits to impose individual and personal liability.'" *Lewis v. Clarke*, 581 U.S. 155, 163 (2017) (quoting *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991)).

Official-capacity suits, however, are different. The Supreme Court has long acknowledged that "a State 'can act only through its officers and agents.'" *Nevada v. Hicks*, 533 U.S. 353, 365 (2001) (quoting *Tennessee v. Davis*, 100 U.S. (10 Otto) 257, 263 (1879)); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 114 n.25 (1984) ("Unlike the English sovereign perhaps, an American State can act only through its officials."); *Briscoe v. President of the Bank of Ky.*, 36 U.S. (11 Pet.) 257,

4

318 (1837) ("A state can act only through its agents; and it would be absurd to say, that any act was not done by a state, which was done by its authorized agents."). Thus, the Court has recognized that "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). In such cases, the suit is "only nominally against the official and in fact is against the official's office and thus the sovereign itself"—triggering sovereign immunity. *Lewis*, 581 U.S. at 162 (citations omitted); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (citations omitted)).

The distinction between official- and individual-capacity suits does not depend "on the characterization of the parties in the complaint." *Lewis*, 581 U.S. at 162; *see Will*, 491 U.S. at 71 (explaining that the distinction is not "a mere pleading device"); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997) ("The real interests served by the Eleventh Amendment must not be sacrificed to elementary mechanics of captions and pleading."); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543 (1986) (disregarding the formal "individual capacity" label where "nothing else in the complaint, or in the record on which the District Court's judgment was based . . . support[s] the suggestion that relief was sought against any [official] in his or her *individual* capacity"). Indeed, "[a] plaintiff cannot circumvent the sovereign immunity enjoyed by states and their employees in their official capacity simply by pleading a cause of action against those same employees as individuals." *Gerlach v. Rokita*, 95 F.4th 493, 500–01 (7th Cir. 2024).

Rather than give dispositive weight to the case caption, "courts should look to whether the sovereign is the real party in interest." *Lewis*, 581 U.S. at 161–62 (citing *Hafer*, 502 U.S. at 25); *see Pennhurst*, 465 U.S. at 101 (holding that sovereign immunity "bars a suit against state officials 'when the state is the real, substantial party in interest'" (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)). The focus of that inquiry, in turn, is on the remedy sought. *See Lewis*, 581 U.S. at 162; *Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (per curiam) ("[R]elief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter."). "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" *Pennhurst*, 465 U.S. at 101 n.11 (quoting *Dugan v. Rank*, 372 U.S. 609, 620 (1963)). Thus, "a suit nominally against state employees in their individual capacities that *demonstrably* has the *identical* effect as a suit against the state is . . . barred" by sovereign immunity. *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001).

5

"Applying this rule can be a knotty and fact-bound inquiry." *Haynes v. Ind. Univ.*, 902 F.3d 724, 732 (7th Cir. 2018). The Fourth Circuit has identified the following factors as relevant: (1) whether "the alleged unlawful actions of the state officials" were "tied inextricably to their official duties," (2) whether "if the state officials had authorized the desired relief at the outset," the "burden" would "have been borne by the State," (3) whether "a judgment against the state officials" would "be institutional in character, such that it would operate against the State," (4) whether "the actions of the state officials" were "taken to further personal interests distinct from the State's interests," and (5) whether "the state officials' actions" were "*ultra vires.*" *Cunningham v. Lester*, 990 F.3d 361, 366 (4th Cir. 2021) (quoting *Martin v. Wood*, 772 F.3d 192, 196 (4th Cir. 2014)). Although the Seventh Circuit has not expressly adopted this test, the *Cunningham* factors provide helpful structure for the court's sovereign immunity analysis. In this case, each points in the same direction—toward finding that the state is the real party in interest and dismissing plaintiffs' § 1983 clams on sovereign immunity grounds.

First, the alleged unlawful actions are inextricably tied to the individual defendants' official duties. As alleged, these defendants violated the Fourteenth Amendment by skirting their duties "as responsible state officials entrusted with the care of vulnerable children." [1] ¶ 3.

Second, if the individual defendants had authorized the desired relief at the outset—that is, if they had put in place policies to ensure expeditious placement—the state would have borne the burden of those policies. The complaint alludes to the individual defendants' official authority "to spend whatever funds are necessary to find appropriate placements for every child in DCFS custody." [1] ¶ 88. Those funds would have had to come from the state's coffers. And the crux of plaintiffs' § 1983 claim is that individual defendants should have invested greater sums toward placement programs, and their failure to do so violated the Fourteenth Amendment.[3] Thus, the second *Cunningham* factor supports finding that the state is the real party in interest. *See Pennhurst*, 465 U.S. at 101 n.11 (noting the "general rule . . . that a

---

[3] As alleged, individual defendants failed to invest sufficient sums of money—approximately "$300-400 dollars per day," per child—toward "[a]ppropriate placements in residential treatment facilities." [1] ¶ 91; *see id.* ¶ 88 (arguing that "a lack of funds is no defense to this suit"). Plaintiffs' response brief confirms that the alleged constitutional deprivations stem from individual defendants' failure to spend more money on placement programs. *See* [23] at 14–15 (asserting that Smith, Dyer-Webster, and Walker failed to "expand the number of placements available to children in DCFS care"); *id.* at 15–16 (asserting that Williams failed to "create or locate appropriate placements"); *id.* at 16 (asserting that Turpeau and Goodwin failed to "add DCFS services and supports" for plaintiffs); *id.* at 16–17 (asserting that Ahern failed to "develop more placement capacity" or "develop new placement resources"); *id.* at 17 (asserting that Dortch, Polan, and Deckert failed to "develop more placement capacity"); *id.* at 17–18 (asserting that Rowitz and Austin-Antoine failed to "create[] new placements or add[] services or capacity").

6

suit is against the sovereign if 'the judgment sought would expend itself on the public treasury'" (quoting *Dugan*, 372 U.S. at 620)); *Gerlach*, 95 F.4th at 501 ("Even if the sought after compensation would not definitively be paid out of the state treasury, if the amount the plaintiff seeks 'should have been paid by the State,' the suit is likely one against the state itself." (quoting *Lenea v. Lane*, 882 F.2d 1171, 1178 (7th Cir. 1989))).

Third, a judgment against the individual defendants would operate against the state. To be sure, "a money judgment would nominally fall on the defendants alone." *Cunningham*, 990 F.3d at 367; *see Conner v. Reinhard*, 847 F.2d 384, 395 (7th Cir. 1988) ("[C]ourts do not generally consider an official sued in his personal capacity as being in privity with the government."). This is notwithstanding the fact that the state chose to indemnify the individual defendants. 5 ILCS 350/2(a); *see Lewis*, 581 U.S. at 164–65 (holding that "an indemnification provision cannot, as a matter of law, extend sovereign immunity to individual employees who would otherwise not fall under its protective cloak"); *Luder*, 253 F.3d at 1023 ("The fact that the state chooses to indemnify its employees who are sued in federal court is irrelevant."). Nevertheless, the court "cannot avert [its] eyes from the effects that such a judgment will have on the State." *Cunningham*, 990 F.3d at 367. Here, as in *Luder*, "[t]he plaintiffs are seeking to accomplish *exactly* what they would accomplish were they allowed to maintain this suit against the state and did so successfully"—namely, "forc[ing] the state to accede" to their view of the Constitution and adjust its policies accordingly. 253 F.3d at 1024. The complaint acknowledges as much, explaining that "Plaintiffs seek damages from Defendants in hopes that this lawsuit will once and for all prevent more children from suffering wrongful incarceration within DCFS care." [1] ¶ 7. Plaintiffs' stated objective "raises serious federalism concerns that go to the heart of the Eleventh Amendment." *Jensen v. State Bd. of Tax Comm'rs of Ind.*, 763 F.2d 272, 277 (7th Cir. 1985) ("[T]he aim of [the] suit against the individual State Tax Board members is to compel them to act solely within their capacity as state officials. The real party in interest in this case is therefore the state of Indiana, and the individual members are merely nominal defendants."); *see also Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002) (explaining that "individual (or personal) capacity suits do not seek to conform the State's conduct to federal law; rather, such suits seek recovery from the defendant personally").

Fourth, plaintiffs do not contend that the individual defendants acted to further their own private interests, rather than the interests of Illinois. Finally (and relatedly), plaintiffs do not challenge the individual defendants' conduct or omission as *ultra vires*. In the context of sovereign immunity, "a state officer may be said to act ultra vires only when he acts 'without any authority whatever.'" *Pennhurst*, 465 U.S. at 101 n.11 (quoting *Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697 (1982) (plurality opinion)). Here, the individual defendants are sued precisely because they did not act despite having the authority to do so. *See* [1] ¶¶ 3, 26, 29, 30, 37, 38, 43, 45, 48, 50, 53, 55, 58. Plaintiffs do not challenge the individual defendants' failure to stay within the bounds of their "delegated power," but their "error[s] in the exercise

7

of that power." *Pennhurst*, 465 U.S. at 101 n.11 (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690 (1949)). Thus, plaintiffs do not challenge the individual defendants' conduct or omissions as *ultra vires*.

All five *Cunningham* factors support the conclusion that the state of Illinois is the real party in interest, and that the individual defendants are sued in their official, not individual, capacity.

Consideration of the *Cunningham* factors accords with the Seventh Circuit's approach to the real-party-in-interest inquiry. Consider, for example, *Genskow v. Prevost*, 825 F. App'x 388 (7th Cir. 2020).[4] As alleged in that case, a tribal chairman shut off a tribal elder's microphone during a council meeting and ordered tribal police officers to remove the tribal elder. *Id.* at 389. The Seventh Circuit held that the tribal elder's § 1983 claims against the officers were official-capacity claims (and thus barred by tribal sovereign immunity) "because the officers' actions 'in essence' were the tribe's own." *Id.* at 390–91 (quoting *Lewis*, 581 U.S. at 162). The "essence" of plaintiffs' claims here is even more apparent than in *Genskow*. Plaintiffs acknowledge that their purpose in bringing this suit is to "once and for all prevent more children from suffering wrongful incarceration while in DCFS care." [1] ¶ 7. This sort of relief is one that can be pursued in federal court only via an action for prospective relief under *Ex parte Young*, 209 U.S. 123 (1908). *See Coeur d'Alene Tribe*, 521 U.S. at 281 (noting that *Ex parte Young* ordinarily applies where there is "[a]n allegation of an ongoing violation of federal law" and "the requested relief is prospective").

*Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603 (7th Cir. 2002), is not to the contrary. There, plaintiffs alleged that individual DCFS officials failed to follow constitutionally adequate procedures during child abuse investigations. The Seventh Circuit did not elaborate whether defendants were entitled to sovereign immunity because the parties did not raise the issue on appeal. But in dicta via a footnote, the court indicated that plaintiffs properly sued defendants in their individual (not official) capacities because "when fairly read, the complaints in this case do not mount a generalized attack on the state agency; rather, they submit that the manner in which individual DCFS employees administered the reporting and investigatory scheme deprived [plaintiffs] of due process of law." *Id.* at 613 n.9.

Here, however, plaintiffs do more than challenge discrete misconduct by specific individuals tasked with managing a distinct aspect of a state program. Rather, plaintiffs "mount a generalized attack on the state agency," *id.*, alleging that the Department and a dozen of its officials are derelict in their core statutory responsibility "to provide social services to children and their families, to operate children's institutions, and to provide certain other rehabilitative and residential services," 20 ILCS 505/1. The complaint challenges the Department's "policies and

---

[4] Although *Genskow* dealt with tribal—rather than state—sovereign immunity, the same principles apply in either context. *See Lewis*, 581 U.S. at 163.

practices"—"going back more than 30 years and continuing to this day"—regarding its treatment of "children in its care." [1] ¶¶ 1, 5, 25; *see Graham*, 473 U.S. at 167 n.14 (indicating that challenges to the "implementation of state policy or custom may be reached in federal court only" under *Ex parte Young*). As discussed, plaintiffs "seek[] damages from Defendants in hopes that this lawsuit will once and for all prevent more children from suffering wrongful incarceration while in DCFS care." *Id.* ¶ 7. Phrased differently, the purpose of this lawsuit is to obtain a money damages judgment that "would expend itself on the public treasury or domain, [and] interfere with the public administration, [and] . . . restrain the Government from acting, or to compel it to act." *Pennhurst*, 465 U.S. at 101 n.11 (quotation and internal quotation marks omitted). That, the Eleventh Amendment does not allow.

Because plaintiffs' § 1983 claims against the individual defendants are "in essence against [the] State," "the State is the real party in interest and is entitled to invoke" sovereign immunity. *Lewis*, 581 U.S. at 162. "[E]ven when properly raised," however, "sovereign immunity is not absolute immunity." *Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012). States "remain subject to suit in certain circumstances." *Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 587 (2022). But none of those circumstances is present here.

First, "the *Ex parte Young* doctrine allows suits . . . for declaratory or injunctive relief against state officers in their official capacities." *Reed v. Goertz*, 598 U.S. 230, 234 (2023). Because plaintiffs seek damages, not forward-looking relief, [1] at 31, *Ex parte Young* is inapplicable. *See Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521 (7th Cir. 2021) ("*Ex parte Young* . . . applies only when a plaintiff seeks prospective relief against an ongoing violation of federal law." (citation omitted)).

Second, "Congress may abrogate state sovereign immunity when exercising its enforcement power conferred by section 5 of the Fourteenth Amendment." *McDaniel v. Syed*, 115 F.4th 805, 820 (7th Cir. 2024) (citation omitted). However, Congress did not do so when it enacted § 1983. *Thomas v. Illinois*, 697 F.3d 612, 613 (7th Cir. 2012) ("Congress did not abrogate the states' sovereign immunity from suit under section 1983, as it could have done." (citations omitted)).

Third, the Constitution itself abrogates state sovereign immunity in a narrow category of cases. *See Torres*, 597 U.S. at 588–89 (listing, as examples, suits between states, suits by the United States against a state, bankruptcy proceedings, and suits involving the federal power of eminent domain). But "[t]he Fourteenth Amendment does not by its own force override the States' Eleventh Amendment immunity . . . ." *Watson v. Div. of Child Support Servs.*, 560 F. App'x 911, 913 (11th Cir. 2014) (quoting *Schopler v. Bliss*, 903 F.2d 1373, 1379 n.4 (11th Cir. 1990)); *see also Santiago v. N.Y. State Dep't of Corr. Servs.*, 945 F.2d 25, 28 (2d Cir. 1991) (rejecting plaintiff's argument that "the Fourteenth Amendment, *ex proprio vigore* works a *pro tanto* repeal of the Eleventh Amendment" as "too facile" (quotation omitted)); *Bartl v. Cook*

9

*Cnty. Clerk of Cir. Ct.*, No. 15-cv-1071, 2015 WL 3505255, at *3 n.3 (C.D. Ill. June 2, 2015) ("Although the Fourteenth Amendment provides Congress with the authority to abrogate a state's sovereign immunity, it did not serve as a blanket abrogation of sovereign immunity." (citing *Seminole Tribe*, 517 U.S. at 59)); *Rosenfeld v. Montgomery Cnty. Pub. Schs.*, 41 F. Supp. 2d 581, 587 (D. Md. 1999) ("The Fourteenth Amendment itself does not abrogate the Eleventh Amendment.").

Finally, "[a] State may of course consent to suit," but "such consent must be 'unequivocally expressed.'" *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 500 (2021) (quoting *Sossamon v. Texas*, 563 U.S. 277, 284 (2011)). Illinois has not expressed—unequivocally or otherwise—its consent to plaintiffs' § 1983 claims.

Because plaintiffs' § 1983 claims are "only nominally against the official[s] and in fact [are] against the sovereign itself," they are barred by sovereign immunity. *Lewis*, 581 U.S. at 162. Thus, plaintiffs' § 1983 claims are dismissed.

## II. ADA & Rehabilitation Act Claims

Next, the court turns to plaintiffs' ADA and Rehabilitation Act claims. These claims are brought against all defendants. [1] at 29–30. However, Title II of the ADA applies only to "public entit[ies]," 42 U.S.C. § 12132, which are defined, in relevant part, as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* § 12131(1); *see City of San Francisco v. Sheehan*, 575 U.S. 600, 610 (2015) ("Only public entities are subject to Title II."). Accordingly, individuals are not proper defendants in damages actions under Title II. *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 670 (7th Cir. 2012); *Ravenna v. Vill. of Skokie*, 388 F. Supp. 3d 999, 1004 (N.D. Ill. 2019).

The same is true under the Rehabilitation Act. *See Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999) (explaining that Title II and the Rehabilitation Act are "nearly identical, and precedent under one statute typically applies to the other"); *Silk v. City of Chicago*, 194 F.3d 788, 798 n.6 (1999) ("[T]he Rehabilitation Act is distinguishable only because it is limited to programs receiving federal financial assistance."). Indeed, the ADA's definition of "public entity" mirrors the earlier-enacted Rehabilitation Act's definition of "program or activity." *Compare* 42 U.S.C. § 12131(1)(B), *with* 29 U.S.C. § 794(b)(1)(A). Thus, plaintiffs' Title II and Rehabilitation Act claims against the individual defendants are dismissed.

That leaves plaintiffs' claims against DCFS itself. Although DCFS is a state agency and thus ordinarily entitled to sovereign immunity, *see Darryl H. v. Coler*, 801 F.2d 893, 906 (7th Cir. 1986), it has waived immunity from Rehabilitation Act claims as a condition of accepting federal funding. [1] ¶ 123; *see Jaros*, 684 F.3d at 672 n.5 (citing *Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir. 2000)); *PennEast Pipeline*,

10

594 U.S. at 500 ("A State may of course consent to suit . . . ."). The ADA and the Rehabilitation Act are "with respect to this lawsuit . . . the same except that the Rehabilitation Act includes as an additional element the receipt of federal funds." *Jaros*, 684 F.3d at 671. Thus, the court need not decide "the thorny question of sovereign immunity" as to plaintiffs' ADA claims, "since [plaintiffs] can have but one recovery." *Id.* at 672. The court turns, therefore, to the merits of plaintiffs' Title II and Rehabilitation Act claims.

To prevail under either statute, a "plaintiff must prove that he is a 'qualified individual with a disability,' that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (quotation omitted).

Here, plaintiffs allege that they and other class members suffer from "mental health issue[s], intellectual disabilit[ies], developmental disabilit[ies] and/or learning disabilit[ies]." [1] ¶ 79. The Department does not dispute that these qualify as disabilities under the ADA, or that plaintiffs were allegedly denied the benefits of the Department's federally funded placement programs. *See* [16] at 20–21. Instead, the Department disputes whether plaintiffs have alleged sufficient facts to support a reasonable inference that defendants' alleged failure to place them in a safe and appropriate environment was "by reason of" their disabilities.

"[D]iscrimination under both acts may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable accommodation, or (3) the defendant's rule disproportionately impacts disabled people." *Ind. High Sch. Athletic Ass'n*, 181 F.3d at 847. Intentional discrimination may rest on a showing of deliberate indifference. *Lacy v. Cook Cnty.*, 897 F.3d 847, 863 (7th Cir. 2018).

To show deliberate indifference, a plaintiff must demonstrate the defendant's "(1) knowledge that a harm to a federally protected right is substantially likely," and "(2) a failure to act upon that likelihood." *Id.* (quoting *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)). Allegations tending to show discriminatory animus—that is, "prejudice, spite, or ill will"—are not required to state an intentional discrimination claim. *Id.* at 862 (quotation omitted).

The Department argues that it did not know about plaintiffs' disabilities and thus could not know that its failure to act harmed plaintiffs' federal right to equal access to the benefits of the placement program. *See* [16] at 20–21. That argument is unpersuasive. As alleged, the Department was made aware of gaps in the placement program "through court filings and hearings, correspondence, meetings, internal data and reports, the legislature, media, and other sources." [1] ¶ 61. The complaint quotes from no fewer than nine of plaintiff Charles Golbert's letters and public hearing testimonies "sounding the alarm bells about RUR problems at DCFS." *Id.* ¶ 67. And

11

state law required the Department to "submit annual reports to the General Assembly that detailed, among other things, the number of children held in detention centers after an order for release . . . ." *Id.* ¶ 69. Further, the allegations that multiple plaintiffs have been placed on individualized education programs, been diagnosed with "depressive disorder, neurodevelopmental disorder, ADHD, and disruptive dysregulation disorder[,]" and been prescribed "medication monitoring, therapy, and anger management" support a reasonable inference that the Department—as their caretaker—knew about their disabilities. *Id.* ¶¶ 11–18; *see Zimmerman v. Bornick*, 25 F.4th 491, 493 (7th Cir. 2022) (requiring courts, at the pleading stage, to "draw all reasonable inferences in the plaintiff's favor").

In sum, the complaint adequately alleges that the Department was deliberately indifferent to plaintiffs' disabilities in funding and managing the placement program, in violation of both Title II and the Rehabilitation Act. As to these claims, the Department's motion to dismiss is denied.

### III. Motion to Strike Class Allegations

Finally, defendants move to strike plaintiffs' class allegations under Federal Rule of Civil Procedure 12(f). [10]. Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Courts in this District, however, evaluate motions to strike class allegations under Rule 23, not Rule 12(f)." *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014). Thus, the court will construe defendants' Rule 12(f) motion as one filed under Rule 23.

Rule 23(c)(1)(A) directs that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." "Most often it will not be 'practicable' for the court to do that at the pleading stage, but sometimes the complaint will make it clear that class certification is inappropriate." *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 829 (N.D. Ill. 2013). For instance, denying class certification at the pleading stage is appropriate where "the plaintiff's class allegations are facially and inherently deficient." *Buonomo*, 301 F.R.D. at 295.

With respect to plaintiff's claims against the Department,[5] the court is not convinced that the complaint's "class allegations are facially and inherently deficient," *Buonomo*, 301 F.R.D. at 295, such that class certification is clearly inappropriate, *Hill*, 946 F. Supp. 2d at 829. "At this procedural stage, the Court is not equipped with the information needed to conduct the rigorous analysis required to determine whether Rule 23's requirements have been satisfied." *Boatwright v. Walgreen Co.*, No. 10 C 3902, 2011 WL 843898, at *2 (N.D. Ill. Mar. 4, 2011); *see Lucas*

---

[5] Defendants' arguments in support of their motion to strike class allegations focus entirely on plaintiffs' claims against the individual defendants. Those claims have been dismissed.

12

*v. Vee Pak, Inc.*, 68 F. Supp. 3d 870, 884 (N.D. Ill. 2014) ("[Q]uestions of superiority and predominance are uniquely difficult to resolve based on the complaint alone[,]" and thus plaintiffs are "entitled to discovery before the defendants can attempt to bar the door to class certification."). Thus, defendants' motion to strike plaintiffs' class allegations is denied as premature.

## CONCLUSION

For these reasons, defendants' motion to dismiss, [10], is granted in part and denied in part. Defendants' motion to strike class allegations is denied. Plaintiffs are given until April 30, 2025, to file a motion for leave to amend, if they wish to do so and believe they can do so consistent with this opinion and Rule 11. If a motion for leave to amend is filed, a copy of the proposed amended complaint indicating what changes the amended complaint makes to the original complaint must be attached to the motion.

Dated: March 31, 2025 /s/ Martha M. Pacold